# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI and INDIANA PUBLIC RETIREMENT SYSTEM, on Behalf of Themselves and All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>  vs.<br><br>LINEAGE, INC., ADAM FORSTE, KEVIN MARCHETTI, WALTER GREGORY LEHMKUHL, ROBERT CRISCI, ABIGAIL FLEMING, SHELLYE ARCHAMBEAU, JOHN CARRAFIELL, JOY FALOTICO, LUKE TAYLOR, MICHAEL JOHN TURNER, LYNN WENTWORTH, JAMES WYPER, BAY GROVE CAPITAL GROUP, LLC, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, BofA SECURITIES, INC., J.P. MORGAN SECURITIES LLC, and WELLS FARGO SECURITIES, LLC,<br><br>     Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs Public Employees' Retirement System of Mississippi ("MSPERS") and Indiana Public Retirement System ("Indiana," and together with MSPERS, "Plaintiffs"), on behalf of themselves and all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined herein), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Lineage, Inc. ("Lineage" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

---

[1] This action is related to *City of St. Clair Shores Police and Fire Retirement System v. Lineage, Inc., et al.*, No. 2:25-cv-12383-DPH-CI (E.D. Mich. filed Sept. 30, 2025) (the "*St. Clair Shores* Action"). Because the unopposed motion of MSPERS and Indiana for appointment as lead plaintiff and approval of selection of lead counsel remains pending in the *St. Clair Shores* Action (*see* ECF Nos. 17, 21) and MSPERS and Indiana are not yet parties in that action, MSPERS and Indiana are filing this complaint to clarify the definitions of the Lineage IPO (defined herein), the Offering Documents (defined herein) used in connection with the IPO, and the Class (defined herein), and to add a claim under § 12(a)(2) of the 1933 Act, 15 U.S.C. § 77*l*(a)(2). The filing of this complaint is without prejudice to the court-appointed lead plaintiff's right in the *St. Clair Shores* Action to file an amended complaint after the Court appoints the lead plaintiff and lead counsel in that action.

1

## NATURE OF THE ACTION

1.     This federal securities class action asserts strict liability claims under the Securities Act of 1933 (the "1933 Act") relating to Lineage's initial public offering (the "IPO"), commenced on or about July 25, 2024, of over 65 million shares of common stock at a price of $78.00 per share. This federal securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired Lineage common stock pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and who were damaged thereby, *i.e.*, the Class.

## JURISDICTION AND VENUE

2.     The claims alleged herein arise under §§ 11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77o. This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the 1933 Act, 15 U.S.C. § 77v.

3.     This Court has personal jurisdiction over each of the Defendants and venue is proper in this District. Defendants conducted the IPO in substantial part from this District, drafted the Offering Documents in substantial part in this District, disseminated the statements alleged to be false and misleading herein from this District, and solicited purchasers of Lineage common stock in and from this District.

## PARTIES

4.    Plaintiff Public Employees' Retirement System of Mississippi, as set forth in the accompanying Certification, purchased Lineage common stock pursuant and/or traceable to the Offering Documents used in connection with the IPO and was damaged thereby.

5.    Plaintiff Indiana Public Retirement System, as set forth in the accompanying Certification, purchased Lineage common stock pursuant and/or traceable to the Offering Documents used in connection with the IPO and was damaged thereby.

6.    Defendant Lineage is a cold storage focused real estate investment trust ("REIT") headquartered in Novi, Michigan. Lineage common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "LINE."

7.    Defendant Adam Forste ("Forste") co-founded Lineage and served as its Co-Executive Chairman at the time of the IPO. Defendant Forste signed the Registration Statement (as defined herein). Defendant Forste also co-founded Bay Grove (defined below) and served as its Managing Partner at the time of the IPO.

8.    Defendant Kevin Marchetti ("Marchetti") co-founded Lineage and served as its Co-Executive Chairman at the time of the IPO. Defendant Marchetti signed the Registration Statement. Defendant Marchetti also co-founded Bay Grove and served as its Managing Partner at the time of the IPO.

9.      Defendant Walter Gregory Lehmkuhl ("Lehmkuhl") served as Lineage's Chief Executive Officer ("CEO") and President at the time of the IPO and was named as a director nominee in the Registration Statement. Defendant Lehmkuhl signed the Registration Statement.

10.     Defendant Robert Crisci ("Crisci") served as Lineage's Chief Financial Officer ("CFO") and President at the time of the IPO. Defendant Crisci signed the Registration Statement.

11.     Defendant Abigail Fleming ("Fleming") served as Lineage's Chief Accounting Officer at the time of the IPO. Defendant Fleming signed the Registration Statement.

12.     Defendants Shellye Archambeau ("Archambeau"), John Carrafiell ("Carrafiell"), Joy Falotico ("Falotico"), Luke Taylor ("Taylor"), Michael John Turner ("Turner"), Lynn Wentworth ("Wentworth"), and James Wyper ("Wyper") were named as Lineage director nominees in the Registration Statement.

13.     The Defendants identified in ¶¶ 7-12 are referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement and/or were named as directors or director nominees of Lineage in the Registration Statement as detailed above. In addition, the Individual Defendants participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. In

4

particular, the Individual Defendants reviewed, edited, and approved the Offering Documents, participated in the IPO, and solicited the purchase of Lineage common stock in the IPO for their own benefit and the benefit of Lineage and Bay Grove as directors, executive officers, and/or major shareholders of the Company and/or the principals of Bay Grove.

14. The Individual Defendants conducted the roadshow along with the Underwriter Defendants (defined herein) to solicit the purchase of Lineage common stock in the IPO. The Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script.

15. Defendant Bay Grove Capital Group, LLC ("Bay Grove") is a private equity firm founded by Defendants Forste and Marchetti. Bay Grove (together with its affiliates) owned Lineage prior to the IPO and sponsored the IPO. Prior to going public, Bay Grove extracted hundreds of millions of dollars from Lineage through a variety of service transactions and other agreements with the Company. Bay Grove and its principals, Defendants Forste and Marchetti, and the Underwriter Defendants were the primary beneficiaries of the IPO, as Lineage used the IPO proceeds to buy operating units from Bay Grove and pay down loans issued, in substantial part, by the Underwriter Defendants. In addition, in connection with the IPO, Bay Grove received a one-time profit sharing increase from Lineage worth $200 million, received $75 million for the repurchase of Lineage operating units, and entered into

a transition services agreement with Lineage that obligated Lineage to pay Bay Grove $8 million annually even if Bay Grove failed to provide any services pursuant to the agreement, as well as numerous other one-sided transactions and agreements with Lineage favorable to Bay Grove. Following the IPO, Bay Grove continued to control a majority of Lineage's combined voting power and, through a stockholders agreement, exerted control and influence over the Lineage Board of Directors (the "Board") disproportionate with its economic stake in the Company.

16.     Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, BofA Securities, Inc., J.P. Morgan Securities LLC, and Wells Fargo Securities, LLC are referred to herein as the "Underwriter Defendants." Pursuant to the 1933 Act, the Underwriter Defendants are liable for the materially false and misleading statements in the Offering Documents as follows:

(a) The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities. They served as the underwriters of the IPO and shared over $191 million in fees collectively for their services, which included the full exercise of their over-allotment option. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of Lineage common stock in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market

Lineage common stock, and those personnel worked on and approved the content of the Offering Documents.

(b) The Underwriter Defendants demanded and obtained an agreement from Lineage that Lineage would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Lineage had purchased millions of dollars in directors' and officers' liability insurance.

(c) Representatives of the Underwriter Defendants also assisted Lineage and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Lineage, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Lineage's operations and financial prospects.

(d) In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Lineage's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the

7

IPO, including the price range at which Lineage common stock would be sold; (iii) the language to be used in the Offering Documents; and (iv) what disclosures about Lineage would be made in the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Lineage's management and top executives, such as the Individual Defendants, the Underwriter Defendants knew, or should have known, of Lineage's existing problems as detailed herein.

(e) The Underwriter Defendants solicited and sold in the IPO Lineage common stock to Plaintiffs and other members of the Class for their own financial benefit. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

17.    The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Plaintiffs and the Class.

## SUBSTANTIVE ALLEGATIONS

18.    Defendants Forste and Marchetti founded Bay Grove in 2007. Approximately a year later, Defendants Forste and Marchetti acquired their first cold-storage warehouse. In 2012, after a series of acquisitions, Defendants Forste

and Marchetti rebranded their cold-storage business as Lineage, which they owned through Bay Grove.

19.    Lineage is a Maryland REIT focused on temperature-controlled cold-storage facilities. To qualify as a REIT, Lineage must distribute annually at least 90% of its REIT taxable income. The Company operates two reportable segments: (i) a Global Warehousing Segment; and (ii) a Global Integrated Solutions Segment.

20.    Through its Global Warehousing Segment, Lineage owns and operates hundreds of temperature-controlled storage facilities used by companies such as grocers and retailers to store food and other perishable products. These warehouses group into four types: (i) distribution centers used by Lineage customers in or near difficult to duplicate metropolitan, infill, or port locations; (ii) public warehouses used to store products for customers outside metropolitan and infill locations; (iii) production-advantaged warehouses near customer production facilities; and (iv) managed warehouses owned or leased by Lineage customers for which the Company manages the warehouse operations on their behalf.

21.    Through its Global Integrated Solutions Segment, Lineage provides customers with logistics solutions to move products through the food supply chain and reduce transportation costs. The largest component of these services relates to transportation and refrigerated car leasing, with a core focus on multi-vendor less-

than-full-truckload consolidation, drayage services to and from ports, over-the-road trucking, and freight forwarding.

22.     The Global Warehousing Segment is the Company's largest and most profitable segment. For Lineage's fiscal 2023, total Global Warehousing Segment revenue was approximately $3.9 billion and its net operating income was over $1.5 billion, compared to $359 million and $64 million for the Global Integrated Solutions Segment, respectively.

23.     In the years leading up to the IPO, Bay Grove embarked on a dramatic expansion of its warehouse acquisition strategy. By 2019, Lineage had become the largest cold-storage company globally, surpassing one billion cubic feet of storage capacity for the first time. Between 2020 and the first quarter of 2024 this acquisition spree accelerated, with Lineage buying dozens of local and regional temperature-controlled storage businesses and roughly tripling its storage capacity. As of March 31, 2024, Lineage operated an interconnected global temperature-controlled warehouse network, comprising over 84.1 million square feet and 3 billion cubic feet of capacity across 482 warehouses predominantly located in densely populated markets, with 312 in North America, 82 in Europe, and 88 in Asia-Pacific.

24.     During this same time period, Lineage's results were buoyed by the effects of the COVID-19 pandemic, as supply chain disruptions and temporary

shortages of food and medicine led to efforts by businesses and governments to improve cold-storage supply chain and distribution networks.

25.     Lineage's rollup acquisition strategy and macroeconomic trends grew the Company's revenue and earnings. For its fiscal year ended December 31, 2023, Lineage generated over $5.3 billion in net revenue, a 43% increase over its fiscal year ended December 31, 2021. Similarly, Lineage's income from operations increased from $88 million in its fiscal 2021 to more than $398 million during its fiscal 2023 – a 350% increase. Lineage represented that these growth metrics were stable and sustainable based on the characteristics of the cold storage industry, for example stating at the time of the IPO that "the U.S. temperature-controlled warehousing industry has experienced relatively stable revenue growth, even in periods marked by significant turmoil in the global financial markets, commodity shocks, secular shifts in consumer habits and preferences, the global COVID-19 pandemic and the ensuing supply chain disruption and periods of significant global inflation." The Company similarly stated that its "broad network of warehouses" located in "critical nodes" of its customers' supply chains supported "high economic occupancy, low volatility in demand, productive NOI [net operating income] generation and strong growth."

26.     On June 26, 2024, Lineage filed a registration statement for the IPO on Form S-11 with the SEC which, after amendments on July 16, 2024 and July 22,

2024, was declared effective on July 24, 2024 (the "Registration Statement"). On July 25, 2024, Lineage filed a registration statement for the IPO on Form S-8 with the SEC for the Amended and Restated Lineage 2024 Incentive Award Plan, which incorporated by reference the Registration Statement and the Prospectus (defined herein) (the "2024 Plan Registration Statement"). On July 25, 2024, Lineage filed a registration statement for the IPO on Form S-8 with the SEC for the Lineage Logistics Holdings, LLC 2021 Value Creation Unit Plan and the Amended and Restated Lineage Logistics Holdings, LLC 2015 Value Creation Unit Plan, each as supplemented by the Omnibus Supplement and Amendment "A" to Lineage Value Creation Unit Plans, which incorporated by reference the Registration Statement and the Prospectus (the "LVCP Awards Registration Statement"). On July 26, 2024, Lineage filed a prospectus for the IPO on Form 424B4 with the SEC, which was incorporated into and formed part of the Registration Statement (the "Prospectus," and together with the Registration Statement, the 2024 Plan Registration Statement, and the LVCP Awards Registration Statement, the "Offering Documents").

27.    Defendants used the Offering Documents to sell over 65 million shares of Lineage common stock to investors at $78 per share, which included the full exercise of the Underwriter Defendants' over-allotment option. The IPO raised more than $5 billion in gross offering proceeds, making it the largest U.S. initial public offering of 2024.

28.     The Offering Documents contained material misrepresentations about Lineage's business, historical financial results, and the industry trends purportedly facing the Company at the time of the IPO.

29.     For example, the Offering Documents failed to disclose that Lineage's financial and operational results had been temporarily inflated leading up to the IPO as a result of artificial market distortions caused by the COVID-19 pandemic, increased supply of cold-storage facilities, and the imposition of unsustainable price increases by Lineage. These trends had peaked in the latter half of 2023 and begun to dramatically reverse prior to the IPO. Rather than disclose these facts, the Offering Documents portrayed Lineage's more muted results for the first six months of 2024 as a return to normalized customer inventory levels, which, after this short "rationaliz[ation]" period, would purportedly allow the Company to enjoy stable revenue growth and steady occupancy and rent escalations as global demand for cold-storage products and services continued to increase and Lineage's purported competitive and technological advantages and economies of scale drove favorable operational and financial results.

30.     In truth, Lineage was in the midst of a sustained downturn, as the Company's customers not only destocked excessive inventory built up during the COVID-19 pandemic, but also shifted to the maintenance of leaner inventories on a go-forward basis and as more cold-storage supply came on line, with Lineage

suffering particularly negative effects in terms of occupancy rates and pricing power due to its recent imposition of unsustainable price increases amongst its customer base.

31.     Since the IPO, which occurred approximately fifteen months before the filing of this complaint, the price of Lineage common stock has fallen to lows near $40 per share – *approximately half the IPO price*. The price of Lineage common stock has remained substantially below the IPO price at the time of filing this complaint.

### MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

32.     The Offering Documents contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the applicable SEC rules and regulations.

33.     Specifically, the Offering Documents stated that the lingering effects of the COVID-19 pandemic had "accelerated trends that had a marked short-term impact on cold storage demand and have the potential to be growth engines for the industry in coming years" after the IPO. The Offering Documents stated:

> ***Outlook***
>
> For the past two decades, the cold storage sector has performed consistently well in both commercial real estate and industry

14

fundamentals. More recently, the COVID-19 pandemic ushered in a period of significant growth for the cold storage industry. Supply chain disruptions in general, but particularly the persistent shortages of food and medicine during the height of the pandemic, led to a rise in awareness among consumers, governments, and investors around the importance of an optimally functioning global cold chain. This awareness contributed to both public and private capital being funneled into the sector, fueling construction activity and revenue growth that allowed cold storage operators to better respond to rising demand for space.

*The pandemic also accelerated trends that had a marked shortterm impact on cold storage demand and have the potential to be growth engines for the industry in coming years. Two key examples are the rapid adoption of online food sales and the heightened emphasis on biopharmaceutical production and distribution (the latter stemming from the lack of suitable facilities for vaccine storage, particularly in developing countries and rural areas of advanced economies).*

34.    The Offering Documents represented that these favorable trends were poised to continue, stating that "significant barriers to entry" in the cold-storage industry, such as high construction costs, "will likely continue to limit speculative construction and competition from new market participants, which typically supports high occupancy and steady rent escalation." The Offering Documents further represented that businesses such as Lineage in the cold-storage industry were therefore purportedly "well positioned for both near-and long-term growth as global demand for temperature-sensitive goods is expected to rise faster than the limited supply of cold storage facilities."

35.    The Offering Documents similarly stated that "steady demand in the food industry has created consistent cold chain demand," which purportedly

15

provided Lineage "with strong cash flows even during periods of broader economic stress." The Offering Documents stated that businesses such as Lineage in "the U.S. temperature-controlled warehousing industry" had "experienced relatively stable revenue growth, even in periods marked by significant turmoil in the global financial markets, commodity shocks, secular shifts in consumer habits and preferences, the global COVID-19 pandemic and the ensuing supply chain disruption and periods of significant global inflation."

36.    The Offering Documents provided the following chart, which depicted the cold-storage industry as experiencing stable revenue growth leading up to the IPO despite broader market volatility:



37.    The Offering Documents described the cold-storage market as "large, growing and resilient, driven by the durability of food consumption through macro cycles, stock-keeping unit proliferation, global population growth, rising disposable

incomes and shifting consumer preferences towards perishable foods." Referencing the "growing demand for cold storage," the Offering Documents represented that these factors "further increase the need for additional temperature-controlled warehousing capacity to meet current and anticipated future market demand" and that "large, well-capitalized operators like Lineage are often best positioned to meet the growing demand for cold storage, provide value-added integrated solutions to their customers and differentiate themselves through investments in technology."

38.    The Offering Documents also highlighted the "history of robust same warehouse growth" purportedly enjoyed by Lineage, stating:

> ***We have a history of robust same warehouse growth with strong operating leverage and cash flow generation. In 2023, our same warehouse NOI was $1,210.9 million, representing growth of 15.3% compared to same warehouse NOI of $1,050.6 million the prior year, and in 2022, our same warehouse NOI was $936.2 million, representing growth of 12.7% compared to same warehouse NOI of $830.5 million in 2021, which growth rates compare favorably to those of our largest competitor and publicly traded peer***. Our same warehouse NOI margins of 40.3% in 2023 compared to 37.2% in the prior year and 39.0% in 2022 compared to 38.8% in the prior year compare favorably to those of our largest publicly traded competitor. ***In addition, we increased our global same warehouse storage revenue per economic pallet 6.2% and 8.1% and our same warehouse services revenue per pallet 7.4% and 13.8% in 2023 and 2022, respectively***.

39.    The Offering Documents further stated that this organic growth was "expect[ed] to continue" at the time of the IPO through the following business initiatives implemented by Lineage.

17

- Leverage the scale of our warehouse network and the breadth of our integrated solutions offerings to win new customers and expand our footprint with existing customers;

- Maximize our same warehouse NOI growth through occupancy and commercial optimization initiatives;

- Further implement productivity tools and cost containment measures;

- Use our integrated platform, scalable corporate infrastructure and business processes to realize synergies from recent acquisitions and drive same warehouse growth post-acquisition;

- Strategically deploy innovative technologies to provide customers more sophisticated solutions while enhancing profitability; and

- Transform the industry through our data science driven approach to warehouse control and design.

40. The statements in ¶¶ 33-39 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time of the IPO.

(a)     that Lineage was then experiencing sustained weakening in customer demand, as additional cold-storage supply had come on line, the Company's customers destocked a glut of excessive inventory built up during the COVID-19 pandemic, and the Company's customers shifted to maintaining leaner cold-storage inventories on a go-forward basis in response to changed consumer trends;

18

(b)     that Lineage had implemented price increases in the lead-up to the IPO that could not be sustained in light of the weakening demand environment facing the Company;

(c)     that Lineage was unable to effectively counteract the adverse trends listed in (a)-(b) above through the use of minimum storage guarantees or as a result of operational efficiencies, technological improvements, or its purported competitive advantages;

(d)     that, as a result of (a)-(c) above, rather than enjoying stable revenue growth, high occupancy rates, and steady rent escalation as represented in the Offering Documents, Lineage was in fact suffering from stagnant or falling revenue, occupancy rates, and rent prices; and

(e)     that, as a result of (a)-(d) above, Lineage's financial results, business operations, and prospects were materially impaired.

41.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the

registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

42.    Under Item 303, the Offering Documents were required to disclose that Lineage was suffering from sustained weakened demand and price erosion at the time of the IPO for the reasons detailed in ¶ 40 as these facts were known to Defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. Similarly, under Item 105, these adverse facts should have been disclosed because they created significant risks that made an investment in Lineage common stock speculative or risky. No such disclosures were made.

43.    Indeed, the risk factors that were provided in the Offering Documents were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose that the potential future adverse impacts described therein were already occurring. For example, the Offering Documents stated that occupancy rates "may decrease relative to 2023 as customers rationalize inventory levels," but failed to disclose that Lineage was already suffering from a sustained decrease in occupancy rates at the time of the IPO. Furthermore, the Offering Documents misleadingly represented that "increased usage of minimum storage guarantees" was expected to "mitigate flow-through of declines in physical occupancy to economic occupancy" when in fact economic and

physical occupancy rates were both declining significantly, and were on track to continue to significantly decline, at the time of the IPO.

## EVENTS FOLLOWING THE IPO

44.     On August 21, 2024, Lineage filed with the SEC its financial results on Form 10-Q for its second fiscal quarter ended June 30, 2024 – the quarter ***before*** the IPO. The Form 10-Q stated that Lineage had suffered an $80 million net loss for the quarter, a 67% increase from the Company's $48 million net less during its first fiscal quarter of 2024. While the Offering Documents provided an expected revenue range for Lineage's second fiscal quarter of 2024, the Offering Documents stated that preliminary estimates of net income (or loss) for the quarter were not available "due to the lack of availability of certain financial information, such as preliminary estimates of certain adjustments (including income tax expense and non-consolidated entity results) that are necessary to provide preliminary estimates of net income (loss)."

45.     On November 6, 2024, Lineage issued a release providing its financial results for its third fiscal quarter ended September 30, 2024 – the quarter during which the IPO was conducted. The press release stated that Lineage had generated $1.335 billion in total revenue, a 0.5% year-over-year increase, and suffered a $543 million net loss during the quarter.

21

46.    On January 14, 2025, *The Wall Street Journal* reported that Lineage was laying off employees just six months after the IPO due to reduced customer demand.

47.    On February 26, 2025, Lineage issued a press release providing its financial results for its fourth fiscal quarter and year ended December 31, 2024. The press release stated that Lineage had generated $1.339 billion in total revenue, a 0.4% year-over-year increase, and suffered an $80 million net loss during the fourth quarter.

48.    Also on February 26, 2025, Lineage held an earnings call with analysts and investors to discuss the Company's fourth quarter and year end 2024 results. During the call, Defendant Lehmkuhl stated:

> [I]nventory holdings have fluctuated over the past several years. Here is a brief timeline of what happened back in 2020, 2021, we saw supply chain chaos, production shortages, port shutdowns, and the inventory was bled down. 2022 was the year where customers began to rebuild inventories quickly, leading to overbuilding.
>
> That overbuilding continued into the 3rd quarter of 2023 when the excess inventory began to unwind. That unwinding continued through the 2nd quarter of 2024. S[aid] another way, inventory levels remained elevated for the first half of 2024. Since then, we've experienced a more normal seasonal pattern, which is what we expect to continue moving forward.

49.    Multiple analysts questioned the elongated timeline for "normaliz[ation]" of Lineage's customer storage inventories following the COVID-19 pandemic. In response, Defendant Crisci admitted that Lineage's business had

22

been "highly unusual" leading up to the IPO and the Company's customers "still had elevated inventory levels" in the first half of 2024.

50.     On April 7, 2025, Lineage announced the dismissal of its auditor KPMG LLP.

51.     On April 30, 2025, Lineage issued a press release providing its financial results for its first fiscal quarter ended March 31, 2025. The press release stated that Lineage had generated $1.292 billion in total revenue, a 2.7% year-over-year *decrease*.

52.     Also on April 30, 2025, Lineage held an earnings call with analysts and investors to discuss the Company's first quarter 2025 results. During the call, analysts expressed "surprise[]" and frustration at Lineage's consistent underperformance. One analyst questioned why the purported "normalization" of customer inventory levels had not occurred on the timeline previously represented by Lineage and its management, stating:

> For the past few quarters, we've been talking about this normalization of inventory levels and obviously, you guys have a lot of experience in the business, but it does seem that each quarter it seems to be the next quarter.
>
> So just curious, as you look at the normalization of inventory levels and the stable consumption that you guys see in the food business, is there something different about this cycle versus your 15-plus years in the in the business that seems to be taking longer for inventories to normalize?

23

Because I mean, COVID was a few years ago, presumably the destocking occur[red] to[o] a few years ago, and the tenant should have been back, especially pre-April 2. So just sort of curious why it seems to just be taking a little bit longer than what we initially spoke about? I think it was back on the on your initial earnings call.

53.    On June 2, 2025, Lineage filed with the SEC a Form 8-K, which announced, among other things, that Defendant Crisci planned to retire from his position as CFO.

54.    On June 3, 2025, Defendants Lehmkuhl and Crisci spoke on behalf of Lineage at the NAREIT REITweek Investor Conference. Rather than the steady growth depicted in the Offering Documents, during the conference Defendant Lehmkuhl admitted that "in the last couple of years you've seen pretty much flat demand" for Lineage's products and services and that the Company was operating in a "flattish environment" in terms of demand.

55.    Since the IPO approximately fifteen months before the date of this complaint, the price of Lineage common stock has fallen to lows near $40 per share – ***approximately half the IPO price***. The price of Lineage common stock has remained substantially below the IPO price at the time of filing this complaint.

## CLASS ACTION ALLEGATIONS

56.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of: all persons and entities that purchased Lineage common stock pursuant, or traceable, or both, to the Offering Documents issued in

connection with Lineage's IPO, which commenced on or about July 25, 2024 (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable. Lineage common stock is actively traded on the Nasdaq and millions of shares were sold in the IPO. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Lineage or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

58.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

59.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the 1933 Act;

(b) whether statements made by Defendants to the investing public in the Offering Documents misrepresented material facts about the business, operations, and risks of investing in Lineage; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

61.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### For Violation of § 11 of the 1933 Act
### Against All Defendants

62.    Plaintiffs repeat and reallege ¶¶ 1-61 by reference.

63.    This Count is brought pursuant to § 11 of the 1933 Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

64.    This Count does not sound in fraud. Plaintiffs do not allege that any of the Defendants had scienter or fraudulent intent, which are not elements of a § 11 claim.

65.    The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

66.    The Defendants named herein were responsible for the contents and dissemination of the Offering Documents as signatories and/or directors and director nominees of the Company, named with their consent in the Offering Documents, or as the underwriters of the IPO.

67.    Lineage, which was owned by Bay Grove, is the registrant and issuer of the common stock sold in the IPO pursuant to the Offering Documents. As the issuer of the shares of Lineage common stock sold in the IPO, Lineage is strictly liable to Plaintiffs and the Class for the material misstatements and omissions.

Signatories of the Offering Documents, and possibly other Defendants, may also be strictly liable to the Class for such material misstatements and omissions.

68.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

69.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements. Rather, each such statement concerned existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

70.    By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, § 11 of the 1933 Act.

71.    Plaintiffs purchased Lineage common stock registered pursuant to the Offering Documents and traceable to the IPO.

72.    Plaintiffs and the Class have sustained damages. The value of Lineage common stock has declined substantially subsequent to and due to Defendants' violations.

73.    At the time of their purchases of Lineage common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the

wrongful conduct alleged herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

## COUNT II
### For Violation of § 12(a)(2) of the 1933 Act
### Against All Defendants

74.     Plaintiffs repeat and reallege ¶¶ 1-73 by reference.

75.     This Count is brought pursuant to § 12(a)(2) of the 1933 Act, 15 U.S.C. § 77*l*(a)(2), on behalf of the Class, against all Defendants.

76.     This Count does not sound in fraud. Plaintiffs do not allege that any of the Defendants had scienter or fraudulent intent, which are not elements of a § 12(a)(2) claim.

77.     Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchases of Lineage common stock pursuant to the defective Prospectus that respectively formed in relevant part the Offering Documents. The actions of solicitation by these Defendants include participating in the preparation of the false and misleading Prospectus and marketing the common stock to investors, including members of the Class.

78.    The Prospectus for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

79.    Each of the Defendants named in this Count owed Plaintiffs and other members of the Class that purchased Lineage common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of the Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

80.    Plaintiffs and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus issued in connection with the IPO at the time they purchased Lineage common stock.

81.    By reason of the conduct alleged herein, the Defendants violated Section 12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class that purchase Lineage common stock

pursuant to the Prospectus issued in connection with the Offering Documents sustained substantial damages in connection therewith. Accordingly, Plaintiffs and the other members of the Class that hold the common stock issued pursuant to the Prospectus issued in connection with the Offering Documents have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members that have sold their Lineage common stock seek damages to the extent permitted by law.

82.     Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

## COUNT III
### For Violation of § 15 of the 1933 Act
### Against Bay Grove, Lineage, and the Individual Defendants

83.     Plaintiffs repeat and reallege ¶¶ 1-82 by reference.

84.     This Count is brought pursuant to § 15 of the 1933 Act, 15 U.S.C. § 77o, against Bay Grove, Lineage, and the Individual Defendants.

85.     Bay Grove controlled Lineage at the time of the IPO through its ownership of Lineage shares and private operating units, its appointment of Lineage executives and members of the Board, its control over the Company through various

transactions and agreements with Lineage as detailed herein, and its historical relationship with the Company and its management.

86.     The Individual Defendants controlled Lineage at the time of the IPO by virtue of their dominant voting power and status as the Company's controlling shareholders, directors, and/or senior officers as detailed herein. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Lineage and through their positions with Lineage's private equity owner, Bay Grove.

87.     Defendants Lineage and Bay Grove controlled the Individual Defendants and all of their employees.

88.     The Defendants named herein each also participated in the violations of § 11 of the 1933 Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing of the Offering Documents, selling Lineage common stock in the IPO, and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiff and certifying Plaintiffs as class representatives under

Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: November 6, 2025                    Respectfully submitted,

By: /s/ *Matthew I. Henzi*
Matthew I. Henzi (P57334)
**ASHERKELLY, PLLC**
25800 Northwestern Hwy Suite 1100
Southfield, MI 48075
Tel: (248) 746-2762
mhenzi@asherkellylaw.com

*Local Counsel for Plaintiffs*

**SAXENA WHITE P.A.**

Marco A. Dueñas (admission forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
mduenas@saxenawhite.com

Maya Saxena (admission forthcoming)
Lester R. Hooker (admission forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com

**LABATON KELLER SUCHAROW LLP**

Francis P. McConville
Connor C. Boehme (admission forthcoming)
140 Broadway
New York, New York 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiffs*